HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| ANAJEAN PENNY,<br><br>    Plaintiff,<br><br> v.<br><br>STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,<br><br>    Defendant. | CASE NO. C18-5195RBL<br><br>ORDER DENYING DEFENDANT'S *DAUBERT* MOTION TO EXCLUDE TESTIMONY OF PLAINTIFF'S EXPERT DR. DOUGLAS COL<br><br>[Dkt. # 23] |

THIS MATTER is before the Court on Defendant's *Daubert* Motion to Exclude Testimony of Plaintiff Penny's Expert Dr. Douglas Col [Dkt. #23]. The Court has reviewed the materials for and against the motion. Oral argument is not necessary. For the reasons below, the motion is **DENIED**.

**I. FACTS**

**A. Plaintiff's Motor Vehicle Accident**

Penny was involved in a motor vehicle accident on August 27, 2014. The accident occurred while Penny was pulled off to the side of the road, eating lunch in her car. Another vehicle lost control and hit the front of Penny's vehicle while she was sitting in her car. Penny claims that, during the collision, she hit the left frontal part of her head but did not lose

consciousness. Penny complains of various neurological and cognitive difficulties since the accident, including memories with vision, memory, and processing.

**B.   Penny's Neuropsychological Evaluation**

Penny was referred to Dr. Douglas Col for a diagnostic neuropsychological evaluation by a Family Nurse Practitioner. Dr. Col examined Penny on March 28, 2016, at which time he administered a battery of "Assessment Instruments," and collected a Psychosocial History of Penny. Dr. Col prepared a report regarding his Psychodiagnostic Testing Evaluation that summarizes the data and findings of each of the measures administered to Penny.

Dr. Col's report indicates that he performed over 25 different diagnostic tests of Penny. Yet, Dr. Col did not administer any symptom or performance validity test designed to independently evaluate the reliability and validity of the data he collected. Instead of administering validity tests, Dr. Col merely made a clinical observation that Penny "appeared to give her best efforts on all tasks" and noted that "the current measures of her abilities, strengths and weaknesses appear to be both valid and accurate."

**C.   Symptom and Performance Validity Standards in the Field of Neuropsychology**

Dr. Col's subjective observation and conclusory evaluation of effort and validity does not meet the standards for symptom and performance validity set forth by the National Academy of Neuropsychology ("NAN") or the American Academy of Clinical Neuropsychology ("AACN"). The NAN advises that the inclusion of validity testing measures in neuropsychological evaluations is medically necessary. The NAN and AACN have also published recommendations for best validity testing practices in an effort to standardize validity testing practices among neuropsychology clinicians.

**D. Dr. Col's Qualifications and Methods**

Dr. Douglas Col is a fully qualified neuropsychologist. His curriculum vitae ("CV") was made an exhibit to his perpetuation deposition taken in this case.

Dr. Col holds a BA in Mathematics and Psychobiology from UC Santa Cruz (1971), and a Master of Science degree in neurobiology from UC Irvine (1972). The curriculum at UC Irvine involved human brain dissection and instruction in the structures of the brain, including nervous and vascular structures, and Dr. Col taught anatomy and physiology to pre-med students. This training was outside of what a typical psychologist or neuropsychologist would receive. He obtained a Master of Arts degree in Clinical Psychology from The Fielding Institute (1994), and a Ph.D. in Clinical Psychology from The Fielding Institute (1997). In the 1990's he first began working with and administering neuropsychological test batteries.

Dr. Col is a licensed psychologist in the State of Oregon and has been practicing clinical psychology and neuropsychology in southern Oregon for about 25 years. In private practice he has conducted a full range of psychological and neuropsychological testing, has had extensive experience evaluating and treating thousands of patients suffering from a wide spectrum of maladies, including those who have suffered traumatic brain injuries.

Dr. Col completed postdoctoral training in advanced neuropsychology with Dr. Elkhonon Goldberg, through The Fielding Institute in 2005-06. According to Dr. Col's testimony, Dr. Goldberg is one of the world's experts in neuropsychology, who has been one of the examiners for board certification in the field of neuropsychology.

**E. Penny's Neuropsychological Evaluation**

In March of 2016 Dr. Col performed neuropsychological evaluation/testing on Penny over the course of three sessions. This was done on referral from Penny's treating nurse practitioner to try and determine the extent of the problems Penny was having and was not a

forensic evaluation. The testing battery he used included overlap/similarities to the battery used later by Defendant's neuropsychologist, Dr. Doppelt, and there were similarities in the scores. As part of the evaluation Dr. Col took a history from Penny, in which she described her auto accident and subsequent symptoms.

Based on Dr. Col's experience and education, he saw common themes between what Penny reported and other traumatic brain injury sufferers, and that the parts of the brain most susceptible to traumatic injuries correlated with many of her symptoms. As part of examining Penny, Dr. Col also reviewed certain of her medical records, including imaging reports, and neurologist and primary care notes.

After conducting the history and neuropsychological test battery, Dr. Col rendered a diagnostic impression of neurocognitive disorder due to traumatic brain injury. When he testified in his perpetuation deposition, he likewise opined that Penny's symptoms and test findings were consistent with a TBI, and that on a more probable than not basis/reasonable medical probability, Penny sustained a traumatic brain injury in the collision. There was no indication in his testing that Penny wasn't giving good effort on the tests. He noted in his report that "she appeared to give her best efforts on all tasks, and the current measures of her abilities, strengths and weaknesses appeared to be both valid and accurate."

**F.  Methods of Neuropsychological Validity Testing**

Based on the postgraduate instruction, in his neuropsychological testing Dr. Col does not utilize *specific* tests designed to test for malingering; instead, he uses the methods taught by Dr. Goldberg to interpret results from other tests in the battery and the patterns of scores to determine whether a test subject is giving good effort or was being accurate in their answers. To paraphrase, Dr. Col was taught to test specific areas of the brain with multiple different tests, which would alert him to anomalous results, and in a way substituted for specific malingering

tests. In Dr. Col's experience as a practitioner in the field, validity tests are generally not done in clinical neuropsychology, whereas forensic psychologists always use them. Dr. Col avoids doing forensic work.

As noted in Defendant's supporting materials (in this instance the 2005 NAN position paper published in the Archives of Clinical Neuropsychology, one of the purposes of which was to offer "recommendations" for appropriate symptom validity assessment), although clinical neuropsychologists are responsible for making determinations about the validity of the information and test data obtained during evaluations, the manner in which such determinations are made may vary considerably depending on the context. Symptom validity assessment "may include" specific tests, indices and observations, but need not always include tests designed to assess symptom validity. Commonly used methods for assessing symptom validity include evaluating consistency of information obtained from interviews, observations and/or test results, performance on neurocognitive and psychological tests, symptom validity tests, and forced-choice tests. Determination of how to assess response validity is made by the clinician based on the unique factors of the given evaluation. It is noted that the potential for symptom fabrication/exaggeration is higher in forensic contexts than in many clinical contexts. Administration of specific symptom validity tests are medically necessary "when determined by the neuropsychologist to be necessary" for assessment of response validity.

Also, from Defendant's supporting materials (in this instance the 2017 survey of INS and NAN member neuropsychologists regarding their practices published in the Archives of Clinical Neuropsychology), validity testing is described as including "administration of tasks that appear difficult but are actually so cognitively simple that even neurologically damaged individuals can successfully complete them." Although the 2017 survey authors explain that

there is "emerging consensus" among experts that validity tests should be employed in every assessment, in the practice of these professionals there is hardly uniform agreement on and adherence to the recommendation that specific validity tests be utilized in all assessments. To quote the authors: "there is still significant variability in the degree to which validity tests are utilized during neuropsychological assessment." Nearly 30% of U.S.-based respondents did not agree that every test battery should include a measure of effort. If they suspected poor effort in the testing, respondents who still sometimes (36.5%), most of the time (17.9%), or always (13.6%) still went ahead and interpreted the cognitive test results of a test battery outnumbered those who never (6.5%) or rarely (25.5%) did. Respondents who believed every battery should include a measure of validity reported spending more of their clinical work time on forensic evaluations relative to those who do not so believe.

## II. ANALYSIS

Rule 702 of the Federal Rules of Evidence requires that "expert testimony must be both reliable and relevant." FRE 702. The party offering the evidence—in this case, Penny—has the burden to show that: (1) the expert is qualified due to having knowledge, skill, experience, training or education in the field of said testimony; (2) such testimony will assist the trier of fact to understand evidence or determine a fact in issue; (3) the testimony is based on sufficient facts or data; (4) the testimony is the product of reliable principles and methods; and (5) the witness reliably applies the principles and methods to the facts of the case. FRE 702; FRE 104(a); *Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579, 588, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

*Daubert* and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141-42 (1999) establish the Court's "gatekeeping" function with respect to the admissibility of expert testimony under Fed. R. Evid. 702. *Kumho* included the following admonition:

> We also conclude that a trial court *may* consider one or more of the more specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability. But, as the Court stated in *Daubert,* the test of reliability is "flexible," and *Daubert*'s **list of specific factors neither necessarily nor exclusively applies to all experts or in every case.** Rather, the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination. [bold emphasis added; "may" as in the original]

526 U.S. at 41-42. *See also United States v. Hankey*, 203 F.3d 1160 (9th Cir. 2000) (Rule 702 is construed liberally in considering admissibility of testimony based on other specialized knowledge); *Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014), quoting *Daubert*, 509 U.S. at 588 (Rule 702 should be applied with a "liberal thrust" favoring admission).

Dr. Col is a qualified neuropsychologist trained as a clinician. In other words, he tries to diagnose and treat patients. The forensic neuropsychologist evaluates and opines on the existence, extent and the cause of the problem. There is ample room in the Courtroom for both experts. The witnesses can be exposed to vigorous cross-examination and the jury can take the resulting information and discern whether the plaintiff is faking or exaggerating her symptoms and the genesis of any health issues related thereto. The only issue before the Court at this

//

//

//

juncture is whether Dr. Col's testimony is based on sufficiently reliable methodology to render it admissible. The Court is satisfied that it is.

This motion is **DENIED**.

IT IS SO ORDERED.

Dated this 24th day of July, 2020.

Ronald B. Leighton
United States District Judge

ORDER - 8