1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8
9
10

ANAJEAN PENNY,

CASE NO. C18-5195JLR

11

                              Plaintiff,

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

            v.

12
13

STATE FARM MUTUAL
AUTOMOBILE INSURANCE
COMPANY,

14
15

                              Defendant.

16

## I.   INTRODUCTION

17

    This matter came for trial on October 5-6, 2020, before the court sitting without a

18

jury.  (*See* 10/5/20 Min. Entry (Dkt. # 55); 10/6/20 Min. Entry (Dkt. # 56).)  Plaintiff

19

Anajean Penny was represented at trial by Scott Staples and Benjamin Melnick of

20

Schauermann Thayer Jacobs Staples & Edwards, P.S.  Defendant State Farm Mutual

21

Automobile Insurance ("State Farm") was represented at trial by Vasudev Addanki and

22

Michelle Kierce of Betts, Patterson & Mines, P.S.  The court has considered the

testimony presented at trial, the exhibits admitted into evidence, and the arguments of

counsel.  The court has weighed the testimony of witnesses, the exhibits, and other

evidence using the required "preponderance of the evidence" standard.  Being fully

advised, and pursuant to Federal Rule of Civil Procedure 52(a), the court makes the

following findings of fact and conclusions of law.[1]

## II.    FINDINGS OF FACT

**A.    The Parties and the Policy**

1.    Ms. Penny is 69 years old and currently is a resident of Grants Pass,
Oregon.  She has four children and 10 grandchildren.  Ms. Penny has been unemployed
since 2009, when she was laid off from her job at an ophthalmology clinic in Vancouver,
Washington.

2.    State Farm, the only defendant in this matter, is incorporated under the laws
of Illinois and has its principal place of business in Illinois.

3.    Ms. Penny had a valid and applicable policy of insurance with State Farm
that had underinsured motorist ("UIM") coverage and personal injury protection ("PIP")
coverage.  (Pretrial Order (Dkt. # 70) at 3.)

**B.    The August 27, 2014 Accident**

4.    Ms. Penny's claims in this matter arise from an automobile accident that
occurred on August 27, 2014 in Vancouver, Washington ("the accident" or "the August

---

[1] To the extent any of the court's findings of fact may be deemed conclusions of law, they
shall also be considered conclusions of law.  Similarly, to the extent any of the court's
conclusions of law may be deemed findings of fact, they shall also be considered findings of fact.
*See In re Bubble Up Del., Inc.*, 684 F.2d 1259, 1262 (9th Cir. 1982).

1    27, 2014 accident").

2        5.    On August 27, 2014, another driver, Nelda Lindell, collided with the

3    vehicle Ms. Penny was sitting in, which was parked on the side of the street, while Ms.

4    Penny ate her lunch.

5        6.    During the accident, Ms. Penny hit her head, hip, and knees on the inside of

6    her vehicle.  (Penny Tr. Test. (Dkt. # 61) at 24:3-25:18.)

7        7.    Following the accident, Ms. Penny was able to call 911 for herself (Tr. Ex.

8    64) and was evaluated at the scene by EMS (Tr. Ex. A-011).  EMS reported that Ms.

9    Penny was cooperative, alert, and oriented.  (Tr. Ex. A-011; Coor Tr. Test. (Dkt. # 62) at

10   11:25-14:2.)  Ms. Penny did not lose consciousness as a result of the accident.  (Tr. Ex.

11   A-011; Coor Tr. Test. at 11:25-14:2; Penny Tr. Test. at 72:19-21.)

12       8.    Ms. Penny's vehicle was a total loss as a result of the accident.  (Penny Tr.

13   Test. at 33:17-18.)

14   **C.    Credibility Determinations**

15       The court makes the following findings regarding witness credibility and the

16   weight it gives to the testimony of certain witnesses:

17       9.    Ms. Penny is the plaintiff in this matter and, therefore, by definition, she is

18   an interested party.  Some portions of her testimony are credible, but other portions are

19   not.  The court finds that Ms. Penny's testimony regarding the automobile accident on

20   August 27, 2014 and the symptoms she suffered in the year after the accident is credible.

21   However, the court also finds that Ms. Penny's testimony regarding the symptoms she

22   was experiencing after August 27, 2015 is inconsistent with medical evidence and is not

1   credible.

2           a.      Dr. Samuel E. Coor, a neurologist who testified on behalf of State

3   Farm, conducted an examination of Ms. Penny's medical records and noted that her

4   treating neurologist, Dr. Oscar Sanchez, reported that Ms. Penny began embellishing her

5   symptoms about a year after the accident.  An August 27, 2015 report from Dr. Sanchez

6   stated that Ms. Penny had a normal neurological examination at that time but exhibited

7   "coordination and gait inconsistent embellishment."  (Tr. Ex. A-025 at 22-24.)  Dr. Coor

8   also testified that, on May 5, 2016, Dr. Sanchez reported that Ms. Penny endorsed "many

9   symptoms and complaints" that were "out of proportion to the mechanism of the

10  accident."  (Coor Tr. Test. at 29:1-14; *see also* Tr. Ex. A-038 at 22 (record review from

11  Dr. Josef Eichinger noting that Dr. Sanchez's findings that Ms. Penny's symptoms and

12  complaints were out of proportion to the August 27, 2014 accident); Tr. Ex. A-002 at 13

13  (record review from Dr. Lee H. Doppelt identifying Dr. Sanchez's May 5, 2016

14  findings).)

15          b.      Dr. Coor also testified that Ms. Penny's records indicated that the

16  chiropractic therapy treatments she received following the accident resulted in significant

17  improvements to the physical pain that Ms. Penny was experiencing.  Specifically,

18  reports issued on April 14, 2015 and June 9, 2015 stated that Ms. Penny's chiropractic

19  treatments were successful and had resulted in significant improvement.  (Tr. Ex. A-025

20  at 21.)  Yet, during Dr. Sanchez's August 27, 2015 examination with Ms. Penny, Ms.

21  Penny reported concerns or complaints with nearly every system that Dr. Sanchez

22

1    inquired about—including systems that she had not previously complained about.   (Coor

2    Tr. Test. at 45:9-47-15; Tr. Ex. A-025 at 38-39.)

3             c.        Dr. Lee H. Doppelt, a psychologist who testified on behalf of State

4    Farm, conducted a neuropsychological evaluation of Ms. Penny on October 19-20, 2017.

5    Dr. Doppelt administered a number of performance validity tests to Ms. Penny, which are

6    designed to measure a patient's effort level.  (*See* Tr. Ex. A-002 at 30-31.)  Dr. Doppelt

7    testified that Ms. Penny's results on these tests suggested that Ms. Penny was putting

8    forth "variable or inconsistent effort" on the tests he administered to her, which suggested

9    to him that Ms. Penny "wasn't necessarily working up to her full potential" during

10   testing.  (Tr. Ex. A-066 ("Doppelt Tr. Test.") at 51:6-54:19.)  Dr. Doppelt also

11   administered the Minnesota Multiphasic Personality Inventory ("MMPI") examination to

12   Ms. Penny and noted that her results on some of the validity indicators from that

13   examination suggested that she "was exaggerating some of her self-reported symptoms."

14   (Doppelt at 66:12-68:10.)

15            d.        Dr. Josef Eichinger, an orthopedic surgeon who testified on behalf of

16   State Farm, testified that the results of Ms. Penny's November 2019 orthopedic physical

17   examination were inconsistent with her self-reported symptoms.  (*See* Eichinger Tr. Test.

18   at 17:22-20:23.)  For example, Ms. Penny reported problems with balance and

19   demonstrated difficulty keeping her balance when she first entered the examination room,

20   yet she was able to toe-walk without difficulty and had no issues getting up and down off

21   the examination table.  (*See id.*)  Dr. Eichinger also reported that Ms. Penny withdrew

22   abruptly any time he attempted to palpitate Ms. Penny's back, even when Dr. Eichinger

1    only lightly touched her back.  Yet, Ms. Penny was able to lie on her back on an

2    examination table without experiencing pain.  (*See id.*)

3              e.      Dr. Coor also conducted a neurological examination of Ms. Penny in

4    November 2019.  During that examination, Ms. Penny self-reported a number of

5    problems with her gait, balance, cognition, and memory, but Dr. Coor concluded that her

6    neurological examination was normal and that the findings during the examination were

7    inconsistent with a neurological injury.  (*See* Coor Tr. Test. at 30:24-35:4.)  As a result,

8    Dr. Coor opined that Ms. Penny was embellishing, malingering, or motivated by

9    secondary gain.  (*See id.*)

10             f.      These inconsistencies and concerns regarding the credibility of Ms.

11   Penny's self-reported symptoms are only a few of the examples presented during trial and

12   in Ms. Penny's medical records.  Due to these issues, the court places little weight on Ms.

13   Penny's testimony regarding the severity of her symptoms after her August 27, 2015

14   evaluation with Dr. Sanchez and on medical evaluations that are based primarily on Ms.

15   Penny's self-reported symptoms after that date.

16        10.    Although Grace Lee is Ms. Penny's daughter, which gives her some

17   interest in this litigation, the court finds that her testimony is credible.  The court notes,

18   however, that the utility of Ms. Lee's testimony is limited by the fact that she

19   acknowledged seeing Ms. Penny only once or twice per year since Ms. Penny has moved

20   to Grants Pass, Oregon.

21        11.    Although Erika Madrigal is a friend of Ms. Penny's and a former co-worker

22   to Ms. Penny, which gives her some interest in this litigation, the court finds that her

testimony is credible.  The court notes, however, that the utility of Ms. Madrigal's

testimony is limited by the fact that she estimated that she has seen Ms. Penny only four

times since the accident in 2014.

12.     The court finds that Melissa Hiller has no stake in the outcome of this

litigation and her testimony is credible.

13.     The court finds no meaningful distinctions in the potential biases of the

expert witnesses called by Ms. Penny and State Farm in this matter.

a.     State Farm's experts—Dr. Doppelt, Dr. Eichinger, and Dr. Coor—

were all retained by State Farm to testify on State Farm's behalf in this litigation, which

creates a potential for bias in State Farm's favor.

b.     Dr. Nicholas Baker, a chiropractor; Dr. Joanna Carter, an

optometrist; Dr. Eric Dukes, an optometrist; and Dr. Heather Kahn, one of Ms. Penny's

primary care physicians, all provided treatment to Ms. Penny and testified on Ms.

Penny's behalf.  Although these providers are not retained litigation experts, the treating

providers were called as witnesses to justify the treatment they provided to Ms. Penny,

and Ms. Penny seeks monetary recovery for the medical expenses generated by these

providers, which creates a potential for bias in Ms. Penny's favor.

c.     Dr. Douglas Col provided treatment to Ms. Penny and was also

retained by Ms. Penny as a litigation expert, which creates a potential for bias in Ms.

Penny's favor.

d.     Wendy Votroubek, a registered nurse, was retained as a litigation

1    expert by Ms. Penny, which creates a potential for bias in Ms. Penny's favor

2          e.    In light of the fact that each of the expert witnesses who testified in

3    this matter have some potential for bias, the court gives little weight to arguments from

4    either party regarding expert witness biases.

5          14.    The court finds that the testimony of Dr. Col is not credible and gives his

6    testimony minimal weight for three main reasons.  First, Dr. Col did not conduct

7    performance validity testing on Ms. Penny, even though two of the leading governing

8    associations for neuropsychology—the American Academy of Clinical Neuropsychology

9    and the National Academy of Neuropsychology—mandate the inclusion of performance

10   validity testing in neuropsychological evaluations.  (Doppelt Tr. Test. at 38:17-41:19.)

11   Instead, Dr. Col relied on his subjective impressions of the validity of Ms. Penny's effort,

12   which introduces a high risk of false negatives.  (*Id.* at 38:17-41:19, 90:23-91:4.)

13   Second, during his testimony, Dr. Col was routinely unable to support his opinions with

14   scientific literature.  For example, Dr. Col testified that that the argument promulgated by

15   Dr. Doppelt that concussive brain injuries typically resolve within three months is

16   "poppycock" and "totally not true," (Tr. Ex. 023 ("Col Tr. Test.") at 26:14-28:3), but

17   when pressed on cross-examination, he was unable to identify any studies or literature

18   that supported that opinion (*id.* at 63:9-656:5).  Third, Dr. Col's practice of debriefing the

19   results of his evaluation with Ms. Penny also fell outside the standard of care in a forensic

20   neuropsychological evaluation and raises a red flag for a significant risk of iatrogenic

21   effects, which could skew the data received during her testimony.  (Doppelt Tr. Test. at

22   94:24-97:10).  Thus, the court concludes that Dr. Col's report and opinions are not

1    credible and largely disregards them.

2         15.    Although the court did not identify any other credibility issues with either

3    party's expert witnesses, the court notes that it affords less weight to the treating

4    providers who testified on Ms. Penny's behalf than to State Farm's experts.  The key

5    challenge for Ms. Penny's experts is that they were tasked with responding to Ms.

6    Penny's subjective reports of her symptoms and coming up with a treatment plan to

7    remedy those symptoms.  As noted above, however, the court concludes that, after Ms.

8    Penny's August 27, 2015 examination with Dr. Sanchez, her self-reports became

9    unreliable and not credible.  Thus, much of the testimony from Ms. Penny's treating

10   providers was based on unreliable reports from Ms. Penny.  In contrast, State Farm's

11   experts conducted evaluations of Ms. Penny that were more persuasive to the court

12   because they were less reliant on Ms. Penny's reports of her symptoms due to the fact

13   that these providers were not charged with treating Ms. Penny's claimed condition.

14   **D.    Injuries Caused by the Accident**

15        16.    Although the parties dispute the nature and severity of the injuries Ms.

16   Penny suffered during the accident, the parties agree that she was injured during the

17   accident.  (*See* Pl.'s FOFCOL (Dkt. # 68) ¶¶ 5-8; Def.'s FOFCOL (Dkt. # 69) ¶¶ 5-8.)

18        17.    The court finds that the evidence presented at trial established that the

19   accident caused the following injuries to Ms. Penny:

20             a.    Mild traumatic brain injury ("mTBI"):  Ms. Penny testified that she

21   struck her head on the interior of her vehicle during the accident, and a number of the

22   treating providers who saw her in the weeks and months after the accident concluded that

1   the symptoms Ms. Penny reported were consistent with a mTBI or post-concussion

2   syndrome.  (Penny Tr. Test at 24:3-25:18; Ex. A-025 at 11-20.)  One of those treating

3   providers, Dr. Baker—one of Ms. Penny's chiropractors who testified that he had

4   experience and training in identifying concussions and concussion symptoms—testified

5   that he believed Ms. Penny suffered a mTBI during the accident based on the information

6   she presented to him during a February 10, 2015 evaluation.  (Tr. Ex. 054 ("Baker Tr.

7   Test.") at 37:14-39:7, 42:20-43:16; 44:1-46:8; Tr. Ex. 055 at 3-4.)  Given that the court

8   credits Ms. Penny's self-reported symptoms in the year following the accident, the court

9   concludes that her testimony, Dr. Baker's testimony, and the medical reports from the

10  providers who treated her in the weeks and months following the accident sufficiently

11  establishes that Ms. Penny suffered a mTBI during the accident.  Further, State Farm did

12  not adequately rebut Ms. Penny's showing on this issue.  Dr. Doppelt opined that Ms.

13  Penny may not have had a mTBI following the accident based in part on the absence of

14  objective medical evidence showing a concussion, but he acknowledged that it was

15  possible that Ms. Penny suffered a mTBI based on the symptoms she reported.  (Ex.

16  A-002 at 41-42; Doppelt Tr. Test. at 105:22-115:25.)  Similarly, although Dr. Coor took

17  issue with the fact that Ms. Penny was diagnosed with a mTBI and post-concussion

18  syndrome based on subjective reports of her symptoms, he acknowledged that the

19  providers who saw Ms. Penny after the accident diagnosed her with a mTBI and that the

20  symptoms that Ms. Penny reported after the accident are consistent with a patient

21  suffering from a mTBI.  (Coor Tr. Test. at 58:6-59:5, 63:16-65:9.)

22              b.      A cervical, thoracic, and lumbosacral sprain and strain injury:  Dr.

1    Eichinger acknowledges that Ms. Penny suffered a soft-tissue sprain and strain injury.

2    (Eichinger Tr. Test. at 12:8-15.)  This is consistent with Dr. Baker's testimony and his

3    February 10, 2015 diagnosis of Ms. Penny.  (Baker Tr. Test. at 30:20-31:9; Tr. Ex. 055 at

4    3-4.)

5             c.    Bilateral knee and ankle sprain and strain injuries:  Dr. Baker

6    diagnosed Ms. Penny with bilateral knee and ankle sprain and strain injuries on February.

7    10, 2015 (Tr. Ex. 055 at 3-4).   This diagnosis is consistent with Ms. Penny's reported

8    symptoms in the year after the accident, which routinely included knee and ankle pain.

9    (Tr. Ex. A-025 at 11, 13-14, 23-24.)  Dr. Eichinger opined that these injuries may have

10   been pre-existing based on his review of Ms. Penny's records (Eichinger Tr. Test. at

11   11:18-12:7), but the court finds that Dr. Baker's diagnosis six months after the accident

12   and Ms. Penny's consistent complaints of knee and ankle pain following the accident are

13   more persuasive than Dr. Eichinger's opinion on this issue.

14           d.    Exacerbation of pre-existing wrist and thumb pain:  Dr. Eichinger

15   concluded that Ms. Penny likely suffered temporary exacerbation of pre-existing wrist

16   and thumb pain during the accident.  (Eichinger Tr. Test. at 11:2-17; Ex. A-039 at 17.)

17       18.    The court finds that Ms. Penny failed to carry her burden to establish that

18   the accident caused Ms. Penny to experience depression.

19           a.    Dr. Kahn, whose office served as Ms. Penny's primary care

20   physician beginning in July 2015, noted that Ms. Penny reported that her depression

21   worsened after the accident.  (Tr. Ex. 028 ("Kahn Tr. Test.") at 24:19-25:5.)  The medical

22   records from that visit indicate that Dr. Kahn's office diagnosed Ms. Penny with

1  depression and concluded that her depressive disorder "has been present for years before

2  the accident but seems to have intensified for her since."  (Tr. Ex. 029 at 5.)  However,

3  beyond noting that Ms. Penny appeared to have depressive disorder in July 2015, Dr.

4  Kahn did not testify that she independently evaluated Ms. Penny for depression and,

5  importantly, her office did not opine that the accident caused Ms. Penny to become

6  depressed.  (*See id.*)  Indeed, Dr. Kahn candidly conceded that she could not opine on

7  whether Ms. Penny's symptoms were due to pre-existing depression, a mTBI, or an

8  increase in depression after the accident because she was unaware of Ms. Penny's

9  baseline prior to the accident.  (Kahn Tr. Test. at 34:16-23.)

10        b.      Notably, on August 27, 2015, Dr. Sanchez reported that he believed

11  that Ms. Penny may be suffering from depression and he recommended that Ms. Penny

12  receive a formal psychiatric consultation.  (Tr. Ex. A-025 at 24.)  However, Dr. Kahn

13  noted that Ms. Penny refused to see a psychiatrist or take psychiatric medication.  (Kahn

14  at 52:19-53:14.)  Thus, Ms. Penny was unable to present any psychiatric expert testimony

15  regarding her depression or the cause of her depression, and the court cannot identify any

16  such evidence in her medical records.

17        c.      Although the court concludes that Dr. Col's testimony in this matter

18  is not credible, the court notes that Dr. Col did not conclude that the accident caused Ms.

19  Penny to become depressed.  To the contrary, Dr. Col concluded that Ms. Penny's

20  neuropsychological test results "did not seem to indicate that she is suffering from any

21  significant psychological sequelae from her accident."  (Tr. Ex. 025 at 11.)

22        d.      Dr. Doppelt acknowledged that, as a general principle, a mTBI or a

1    traumatic physical injury and subsequent slow recovery could cause depression for

2    individuals like Ms. Penny—especially given that Ms. Penny had pre-existing depression.

3    (Doppelt Tr. Test. at 139:12-140:11, 130:24-131:8, 145:25-146:10, 150:5-19.)  His expert

4    report concluded, however, that any number of factors could be causing any depression

5    that Ms. Penny experienced after the accident.  (Tr. Ex. A-002 at 43-44 (identifying

6    family relationships, social isolation, past abusive relationships, opioid use, poor stress

7    management, and avoidance of mental health treatment as possible causes for

8    depression).)  Ultimately, he concluded that the accident did not cause any of the

9    neurological symptoms that Ms. Penny reported.  (*Id.*)

10           e.      Dr. Coor also speculated that the accident may have been a "trigger"

11   event for Ms. Penny that exacerbated her psychological symptoms.  (Coor Tr. Test. at

12   59:8-60:2.)  But Dr. Coor did not diagnose Ms. Penny with depression caused by the

13   accident—his report listed the diagnoses that he believed were related to the August 27,

14   2014 accident, and he did not include depression.  (Tr. Ex. A-025 at 37.)  Further, like Dr.

15   Doppelt, Dr. Coor clarified that Ms. Penny's response to the accident is just one of many

16   relevant factors that could have impacted Ms. Penny's psychological state.  (Coor Tr.

17   Test. at 59:8-60:2.)

18           f.      In sum, the key deficiency for Ms. Penny is the absence of credible

19   expert testimony opining that the accident caused Ms. Penny to become depressed.  This

20   deficiency is particularly poignant here, given that Ms. Penny had pre-existing issues

21   with depression, (Tr. Ex. A-025 at 6), her treating providers identified possible sources of

22   depression beyond the accident (*see id.* at 15 (identifying complaints of loneliness), 22

1  (discussing history of abusive relationships), 33 (discussing complaints of social isolation

2  and abusive past relationships)), and State Farm's experts opined on a number of other

3  potential causes for any depression that Ms. Penny may have been experiencing (Tr. Ex.

4  A-002 at 43-44 (identifying family relationships, social isolation, past abusive

5  relationships, opioid use, poor stress management, and avoidance of mental health

6  treatment as possible causes for depression); Coor Tr. Test. at 59:8-60:2).

7       19.    Ms. Penny failed to establish that the vision and balance issues that Dr.

8  Carter and Dr. Dukes treated her for were caused by the accident or the mTBI that Ms.

9  Penny suffered during the accident.

10         a.    In the days and weeks after the accident, Ms. Penny reported no

11  vision issues or eye pain.  (Tr. Ex. A-025 at 11-17.)  Ms. Penny reported blurred vision

12  for the first time on November 11, 2014 (*id.* at 18), and, according to Dr. Coor's review

13  of Ms. Penny's medical records, she did not raise vision issues again until her August 27,

14  2015 examination with Dr. Sanchez (*id.* at 22-23).  Although Ms. Penny self-reported

15  gait and balance issues in the August 27, 2015 examination with Dr. Sanchez, Dr.

16  Sanchez concluded that those symptoms were embellished and likely nonphysiologic.

17  (Tr. Ex. A-025 at 22-24.)

18         b.    Ms. Penny did not receive treatment from Dr. Carter for vision

19  issues until August 22, 2017—three years after the accident.  (Tr. Ex. A-025 at 35.)  Ms.

20  Penny did not receive treatment from Dr. Dukes until August 26, 2019—five years after

21  the accident.  (Tr. Ex. 050 ("Dukes Tr. Test.") at 12:17-13:11.)  By the time Ms. Penny

22  saw these providers, other providers—including Dr. Sanchez and Dr. Doppelt—had

1    concluded that Ms. Penny had a history of embellishing her symptoms.

2              c.    Dr. Dukes and Dr. Carter acknowledged that they were not provided

3    with Ms. Penny's full medical records.  (Tr. Ex. 057 ("Carter Tr. Test.") at 50:17-24;

4    Dukes Tr. Test. at 47:17-48:20.)  Dr. Dukes stated on cross examination that he was

5    unaware that Dr. Sanchez had determined that Ms. Penny had a normal neurological

6    evaluation on August 27, 2015—four years before Ms. Penny saw Dr. Dukes.  (Dukes Tr.

7    Test. at 48:5-49:5.)

8              d.    Because Dr. Dukes and Dr. Carter did not have a full medical history

9    from Ms. Penny and because their opinions are heavily reliant on Ms. Penny's unreliable

10   self-reported symptoms and her subjective responses to the examinations administered by

11   Dr. Dukes and Dr. Carter, the court gives little weight to their conclusions.

12        20.    Although the court concludes that Ms. Penny carried her burden to establish

13   that the accident caused a mTBI; a cervical, thoracic, and lumbosacral sprain and strain

14   injury; bilateral knee and ankle sprain and strain injuries; and exacerbation of pre-existing

15   wrist and thumb pain, the court finds that Ms. Penny failed to prove that any of these

16   injuries continued to impact her after August 27, 2015.

17             a.    Mild traumatic brain injury ("mTBI"):  Although the testimony and

18   evidence presented at trial regarding when Ms. Penny's mTBI symptoms should have

19   resolved varied, the court finds that Ms. Penny established that the accident caused

20   mTBI-related symptoms until August 27, 2015.

21                  i.    On October 1, 2014, a neurologist who examined Ms. Penny

22   opined that Ms. Penny should reach "complete resolution in several more weeks to a few

1   months." (Tr. Ex. A-025 at 16.)

2          ii.    Dr. Baker determined that Ms. Penny continued to suffer

3   from symptoms from her mTBI in February 2015 (Tr. Ex. 055 at 2-4), but his testimony

4   does not clearly indicate when he believes Ms. Penny's concussion should have resolved.

5          iii.    Although Dr. Sanchez concluded on August 27, 2015 that

6   Ms. Penny was still suffering from postconcussive syndrome, he also concluded that she

7   had a normal neurological examination and noted that Ms. Penny appeared to be

8   embellishing some of her gait and coordination symptoms. (Tr. Ex. A-025 at 24.) Dr.

9   Sanchez explained to Ms. Penny that if she optimized mental health treatment, her

10   prognosis would be good given her essentially normal neurologic examination. (*Id.*;

11   Coor Tr. Test. at 27:23-28:3). In a follow-up appointment on May 5, 2016, Dr. Sanchez

12   concluded that Ms. Penny endorsed "many symptoms and complaints," that were "out of

13   proportion to the mechanism of the accident." (Coor Tr. Test. at 29:1-14; Tr. Ex. A-038

14   at 22; Tr. Ex. A-002 at 13.)

15          iv.    Dr. Col's March 28, 2016 report opined that Ms. Penny

16   suffered from a neurocognitive disorder due to a mTBI at that time (Tr. Ex. 025 at 11),

17   but the court has concluded that his report and testimony in this matter is not credible.

18          v.    Dr. Kahn testified that her impressions of Ms. Penny's mTBI

19   prognosis were largely impacted by Dr. Col's report. (Kahn Tr. Test. at 33:19-34:15.)

20          vi.    The court gives little weight to Dr. Carter and Dr. Dukes'

21   opinions regarding Ms. Penny's mTBI symptoms for the reasons articulated above

22   regarding their lack of familiarity with Ms. Penny's medical history and their reliance on

1   Ms. Penny's self-reported symptoms.

2            vii.    Dr. Doppelt examined Ms. Penny on October 19-20, 2017

3   and concluded that Ms. Penny's neurological profile did not support the conclusion that

4   she was suffering ongoing effects from a mTBI at that time.  (Tr. Ex. A-002 at 41-44.)

5   Dr. Doppelt also testified that any mTBI symptoms that Ms. Penny experienced should

6   have resolved by November 2014 based on his experience and on scientific literature that

7   establishes that symptoms from mTBIs are generally resolved within three months of the

8   injury (Doppelt Tr. Test. at 26:10-29:9), although Ms. Penny identified a recent study that

9   suggests that mTBI symptoms can continue to exist for 12 months after an injury

10  (Doppelt Tr. Test. at 132:18-139:11).  Although the court credits Dr. Doppelt's direct and

11  cross examination testimony regarding his experience and the general consensus in

12  scientific literature, because Dr. Doppelt was unable to examine Ms. Penny until October

13  2017, the court finds that his opinion on the date that Ms. Penny's symptoms should have

14  resolved is less persuasive than opinions from her treating providers in the year following

15  the August 27, 2015 accident.

16           viii.    Dr. Coor examined Ms. Penny on November 9, 2019 and

17  concluded that, at that time, Ms. Penny did not exhibit symptoms of a mTBI or any

18  residual effects from a mTBI.  (Tr. Ex. A-039 at 14.)  Indeed, Dr. Coor concluded that

19  Ms. Penny did not have any residual symptoms from the accident from a neurological

20  standpoint.  (*Id.*)  Dr. Coor also testified that, based on his experience and the relevant

21  scientific literature, he would have expected that Ms. Penny's symptoms would have

22  resolved two weeks to six months after the injury.  (Coor Tr. Test. at 62:10-63:13.)

1   Although the court credits Dr. Coor's testimony regarding his experience and the general

2   consensus in scientific literature, because Dr. Coor was unable to examine Ms. Penny

3   until November 2019, the court finds that his opinion on the date that Ms. Penny's

4   symptoms should have subsided is less persuasive than opinions from her treating

5   providers in the year following the accident.

6                          ix.     Ultimately, based on the relevant scientific literature, Ms.

7   Penny's reported symptoms in the year following the accident, and the records from Ms.

8   Penny's treating providers in the year following the accident, the court finds that Ms.

9   Penny established that she experienced symptoms from the mTBI injury until August 27,

10  2015.  Although the court credits Dr. Coor and Dr. Doppelt's conclusions that mTBI

11  symptoms typically resolve within three to six months on the high end, the court also

12  credits the study Ms. Penny identified that suggests symptoms may last up to a year or

13  longer.  Moreover, Ms. Penny's October 1, 2014 medical records estimate that her

14  symptoms could last few months, Dr. Baker opined that Ms. Penny was still experiencing

15  concussion symptoms in February 2015, and there is no evidence or suggestion that Ms.

16  Penny began embellishing her symptoms until August 27, 2015.  By August 27, 2015,

17  however, Ms. Penny had a normal neurological evaluation and Dr. Sanchez specifically

18  noted that she had begun embellishing her symptoms.  The brain MRI Dr. Sanchez

19  recommended for Ms. Penny also returned no noticeable results indicating neurological

20  deficiencies.  Thus, the court concludes that the evidence supports a finding that Ms.

21  Penny experienced concussion symptoms until August 27, 2015, but the significant issues

22  with Ms. Penny's credibility and the absence of objective evidence of mTBI symptoms

1   after that date leads the court to conclude that Ms. Penny failed to establish that she was

2   experiencing symptoms caused by her mTBI after the August 27, 2015 evaluation with

3   Dr. Sanchez.

4               b.      Cervical, thoracic, lumbosacral, bilateral knee, and bilateral ankle

5   sprain and strain injuries:  The court finds that Ms. Penny established that she

6   experienced symptoms from her various sprain and strain injuries until August 27, 2015.

7                   i.      In the year following the accident, Ms. Penny's medical

8   records consistently indicate that Ms. Penny was experiencing back, neck, knee, and

9   ankle pain.  (Tr. Ex. A-025 at 10-24.)

10                   ii.      Dr. Baker concluded that Ms. Penny was still suffering from

11   sprain and strain injuries in February 2015.  (Tr. Ex. 055 at 2-4.)  His reports noted,

12   however, that Ms. Penny saw improvement in April and June 2015.  (Tr. Ex. A-025 at

13   21.)

14                   iii.      Medical reports from Dr. Kahn's office from a July 22, 2015

15   examination state that Ms. Penny was progressing well in physical therapy.  (Tr. Ex.

16   A-025 at 21-22.)  According to Dr. Kahn, Ms. Penny reported joint pain during this initial

17   visit (Kahn Tr. Test. at 21:4-11), and Dr. Kahn recalls that Ms. Penny reported back and

18   neck pain resulting from the accident during one of Dr. Kahn's appointments with Ms.

19   Penny (id. at 36:11-17).  However, it does not appear that the provider in Dr. Kahn's

20   office who saw Ms. Penny on July 22, 2015 noted any significant back, neck, knee, or

21   ankle pain during this examination.  (Tr. Ex. A-025 at 21-22; Tr. Ex. 029 at 1-6.)

22                   iv.      Despite reports that physical therapy and chiropractic therapy

1  had gone well for Ms. Penny in the months following the accident, Ms. Penny reported

2  pain and issues with nearly all of her systems to Dr. Sanchez on August 27, 2015.  (Tr.

3  Ex. A-025 at 22-24.)

4              v.    Dr. Eichinger evaluated Ms. Penny on November 9, 2019 and

5  concluded that any sprain and strain injuries she had suffered were resolved by that time.

6  (Tr. Ex. A-039 at 11-12.)  He also opined that sprain and strain injuries are typically

7  resolved within six to 12 weeks (Eichinger Tr. Test. at 23:23-24:17) and that Ms. Penny's

8  sprain and strain injuries were resolved by November 2014 based on a review of Ms.

9  Penny's records (*id.*; Tr. Ex. A-039 at 11-12, 18).  Because Dr. Eichinger was unable to

10  examine Ms. Penny until November 2019, the court finds that his opinion on the date that

11  Ms. Penny's symptoms should have subsided is less persuasive than opinions from her

12  treating providers in the year following the accident.

13              vi.    Ultimately, based on Ms. Penny's reported symptoms in the

14  year following the accident, the records from Ms. Penny's treating providers in the year

15  following the accident, and the testimony of Dr. Baker, the court finds that Ms. Penny

16  established that she experienced symptoms from her sprain and strain injuries until

17  August 27, 2015.  In light of the inconsistencies in her reported symptoms in her August

18  27, 2015 examination with Dr. Sanchez and Dr. Sanchez's conclusion that Ms. Penny

19  embellished her symptoms on August 27, 2015, the court finds that Ms. Penny failed to

20  establish that she was experiencing symptoms caused by her sprain and strain injuries

21  after the August 27, 2015 evaluation with Dr. Sanchez.

22              c.    <u>Exacerbation of pre-existing wrist and thumb pain</u>:  Dr. Eichinger

1    concluded that these injuries lasted "a few days," (Tr. Ex. A-039 at 18), and Ms. Penny

2    does not specifically dispute that conclusion.  Thus, the court finds that the exacerbation

3    of Ms. Penny's pre-existing wrist and thumb pain was resolved shortly after the accident.

4         21.    Based on the testimony presented at trial, the court finds that the injuries

5    caused by the accident resulted in pain and suffering from the period of August 27, 2014

6    until August 27, 2015.

7         22.    Because Ms. Penny was unable to establish that she continued to

8    experience symptoms caused by the accident after August 27, 2015, the court finds that

9    she will not suffer future pain and suffering as a result of the accident.

10        23.    Based on the testimony presented at trial, the court finds that the injuries

11   caused by the accident resulted in loss of enjoyment of life from the period of August 27,

12   2014 until August 27, 2015.

13        24.    Because Ms. Penny was unable to establish that she continued to

14   experience symptoms caused by the accident after August 27, 2015, the court finds that

15   she will not suffer future loss of enjoyment of life as a result of the accident.

16   **E.    Medical Expenses**

17        25.    The testimony of Wendy Votroubek, RN established that the reasonable

18   value of Ms. Penny's past medical expenses for the treatment she received after the

19   //

20   //

21   //

22   //

1  subject auto collision to be $56,958.41, consisting of:

| Description/Provider | Date(s) | Amount |
|---|---|---|
| Ambulance/American Medical Response | 8/27/14 | $1,014.75 |
| Legacy Salmon Creek Hospital | 8/27/14 | $2,656.00 |
| Vancouver Radiologists | 8/27/14 | $147.67 |
| AFC Urgent Care/Doctors Express | 8/30/14 | $457.00 |
| Mitchell Pharmacy Solutions | 8/30/14 | $28.85 |
| Motion Chiropractic | 9/1/14 to 10/21/14 | $1,460.00 |
| Evergreen Medical Center | 9/5/14 to 12/17/14 | $1,192.00 |
| PeaceHealth Southwest Medical Center | 9/5/14 | $84.98 |
| PeaceHealth Medical Group Neurology | 10/1/14 to 12/17/14 | $536.00 |
| Homewatch Caregivers | 10/8/14 to 10/24/14 | $657.15 |
| Visiting Angels | 11/3/14 to 11/24/14 | $362.10 |
| PeaceHealth Medical Group Bellingham | 11/11/14 | $318.20 |
| Whatcom Physical Therapy/Ferndale Physical Therapy | 11/17/14 to 11/25/14 | $672.00 |
| Thorsen Chiropractic | 2/10/15 to 3/21/18 | $8,345.00 |
| Vision Center – Walmart | 4/21/15 | $278.00 |
| Rogue Medicine | 7/22/15 to 5/1/17 | $5,800.02 |
| Bi-Mart (EnterpriseRx Pharmacy System) | 8/12/15 to 11/23/15 | $222.36 |
| Asante Physician Partners | 8/27/15 to 2/2/17 | $985.00 |
| Options Southern Oregon | 10/2/15 to 8/19/18 | $14,851.87 |
| Asante Three Rivers Medical Center | 11/2/15 | $3,730.07 |
| Advanced Imaging Associates | 11/2/15 to 1/12/16 | $441.00 |
| EasyFill PRN Pharmacy | 12/8/15 to 6/25/18 | $1,961.80 |
| Douglas A. Col PhD | 2/15/16 to 4/8/16 | $1,269.50 |
| Cascade Eye Center | 2/2/16 | $250.00 |
| Providence Health & Services- Medford Med Center Neuro Therapy OP | 6/4/16 to 4/4/17 | $7,137.09 |
| Eye Care Group | 6/30/17 to 8/24/17 | $1,263.00 |
| Insight Vision Therapy | 8/22/17 to 11/16/17 | $660.00 |
| Mountainview Family Practice | 1/28/18 | $197.00 |

(Tr. Ex. 099, ¶¶ 4-5, Ex. 2.)

## III.   CONCLUSIONS OF LAW

A.   **Background**

1.      Ms. Penny brings a breach of contract claim against State Farm based on

State Farm's alleged failure to pay underinsured motorist ("UIM") benefits to Ms. Penny. (*See* Compl. (Dkt. # 1-2) ¶¶ 4.1-4.3.)  This court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1).  Venue is proper in the Western District of Washington pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

2.      Although Ms. Penny brings this action as a breach of contract claim, the question currently before the court is solely related to the nature and extent of the damages caused by Ms. Lindell on August 27, 2014.  (*See* Pretrial Order at 3-4.)  The court understands that State Farm does not dispute that Ms. Lindell acted negligently when she struck Ms. Penny's vehicle.  (*See id.*; Def.'s FOFCOL ¶ 27.)  Thus, the court concludes that Ms. Lindell is liable for the August 27, 2014 accident, and focuses on the amount of damages caused by the accident.

3.      Washington law provides the substantive law to govern this case because the collision occurred in Washington.  *Erie RR Co. v. Tompkins*, 304 U.S. 64, 78-79 (1938); *see also Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 427 (1996); *State Farm Fire & Cas. Co. v. Smith*, 907 F.2d 900, 902 (9th Cir. 1990).

4.      State Farm does not dispute that it "steps into the shoes" of Ms. Lindell for purposes of determining the amount of compensatory damages that Ms. Penny is entitled to due to the nature of Ms. Penny's UIM coverage.  (*See* Def.'s FOFCOL ¶ 28; Pretrial Order at 3-4.)

5.      The court also understands that (1) Ms. Penny has received insurance proceeds from State Farm under Ms. Penny's PIP insurance, (2) Ms. Lindell's insurer has

1    also paid Ms. Penny liability policy limits, (3) Ms. Penny's UIM policy has a policy

2    limit, and (4) that the parties intend to stipulate to the amounts that Ms. Penny has already

3    received and the amount of Ms. Penny's UIM insurance limits after the court issues its

4    findings of fact and conclusions of law.  (*See* Pretrial Order at 3-4.)  The parties agree

5    that Ms. Penny is not entitled to damages above the applicable UIM policy limits and that

6    any compensation that the court awards in this order must be offset by the amount of

7    insurance proceeds Ms. Penny has already received.  (*See id.*)  Thus, the court reserves

8    final judgment in this matter until it receives the parties' stipulation.

9            6.      At the parties' request, the court admits the following exhibits related to the

10   parties' perpetuation depositions:  Exs. 023-027, and Ex. 094 (Dr. Col); Exs. 028-038,

11   040-049, and Ex. 095 (Dr. Kahn); Exs. 050-053, 096 (Dr. Dukes); Exs. 054, 056, 097

12   (Dr. Baker); Exs. 057-063, 098 (Dr. Carter); Exs. A-001-A-005, A-066-A069 (Dr.

13   Doppelt).  The court also admits the following exhibits related to Ms. Votroubek's

14   declaration, which was admitted in lieu of live testimony:  Exs. 001-022.  These exhibits

15   are admitted in addition to the exhibits admitted by the court during live witness

16   testimony, which are currently reflected on the court's trial exhibit list.  (*See* Tr. Ex. List

17   (Dkt. # 58).)

18   **B.      State Farm's Motion in Limine**

19           7.      State Farm filed a motion *in limine* seeking to exclude any expert or

20   causation opinions from Ms. Penny's treating providers—Dr. Baker, Dr. Carter, Dr.

21   Heather Kahn, and Dr. Eric Dukes—because those providers did not disclose expert

22   opinions under Federal Rule of Civil Procedure 26(a)(2)(B).  (*See* MIL (Dkt. # 35) at

1    2-5.)  On September 25, 2020, the court deferred ruling on that motion *in limine* until the

2    conclusion of trial.  (*See* 9/25/20 Order at 4-5.)

3            8.      The court DENIES State Farm's motion *in limine*.  The court concludes

4    that Ms. Penny's treating providers were properly disclosed under Rule 26(a)(2)(B) and

5    did not need to present a written report because the opinions they presented at trial "were

6    formed during the course of treatment."  *Goodman v. Staples The Office Superstore*,

7    LLC, 644 F.3d 817, 826 (9th Cir. 2011).  Moreover, as noted above, the court gave

8    minimal weight to Dr. Dukes and Dr. Carter's testimony.  Thus, to the extent that either

9    of those providers presented testimony "beyond the scope of the treatment rendered," *see*

10   *id.*, the court disregarded that testimony.

11   **C.     Causation**

12           9.      The court concludes that Ms. Lindell's negligence—which is attributed to

13   State Farm for purposes of determining UIM coverage—was the proximate cause of Ms.

14   Penny's mTBI; Ms. Penny's cervical, thoracic, lumbosacral, bilateral knee, and bilateral

15   ankle sprain and strain injuries; and the exacerbation of Ms. Penny's pre-existing wrist

16   and thumb pain, as described above.

17           10.     Washington law provides that the court "must determine the amount of

18   money that will reasonably and fairly compensate the plaintiff for such damages as . . .

19   were proximately caused by the negligence of the defendant."  WPI 30.01.01.  The

20   burden of proving damages by a preponderance of the evidence rests with Ms. Penny.  *Id.*

21           11.     "A proximate cause is one that in natural and continuous sequence,

22   unbroken by an independent cause, produces the injury complained of and without which

the ultimate injury would not have occurred." *Attwood v. Albertson's Food Ctrs., Inc.*, 966 P.2d 351, 353 (Wash. Ct. App. 1998).  "Whether or not causation must be shown with expert testimony depends on the nature of the injury.  Expert testimony is required to establish causation when an injury involves obscure medical factors that would require an ordinary lay person to speculate or conjecture in making a finding." *Bruns v. PACCAR, Inc.*, 890 P.2d 469, 477 (Wash. Ct. App. 1995).  As discussed above, the court concludes that Ms. Penny's medical records and the testimony presented at trial establishes that Ms. Penny suffered a mTBI; cervical, thoracic, lumbosacral, bilateral knee, and bilateral ankle sprain and strain injuries; and the exacerbation of pre-existing wrist and thumb pain as a proximate result of the August 27, 2014 accident.  Ms. Penny did not establish that the vision and balance issues for which she sought treatment from Drs. Carter and Dukes were proximately caused by the August 27, 2014 accident, and she did not establish that any depression she suffered after the August 27, 2014 accident was proximately caused by the August 27, 2014 accident.

**D.  Damages**

12.    Having concluded that the August 27, 2014 accident was the proximate cause of injuries to Ms. Penny, the court must determine the appropriate amount of damages.

13.    Past Medical Expenses.  As discussed above, the declaration of Ms. Votroubek establishes that the reasonable value of Ms. Penny's past medical expenses for the treatment she received after the August 27, 2014 accident is $56,958.41.  (Tr. Ex. 099.)  However, medical expenses must be reasonable, necessary, and related to the

ORDER - 26

1   August 27, 2014 accident to be recovered as damages in this case.  *See Palmer v. Jensen*,

2   937 P.2d 597 (Wash. 1997).  Thus, the court must determine whether the expenses

3   identified in Ms. Votroubek's report are reasonable, necessary, and related to the August

4   27, 2014 accident.

5       14.     With the exception of the April 21, 2015 charge for $278.00 at Vision

6   Center – Walmart—which Ms. Penny did not recall on her direct examination (Penny at

7   54-55)—the court finds that the medical expenses Ms. Penny incurred from August 27,

8   2014 until August 27, 2015 were reasonable, necessary, and related to the injuries caused

9   by the accident.

10      15.     Of the charges detailed in Ms. Votroubek's report, the court finds that the

11  medical expenses from Ambulance/American Medical Response, Legacy Salmon Creek

12  Hospital, Vancouver Radiologists, AFC Urgent Care/Doctors Express, Mitchell

13  Pharmacy Solutions, Motion Chiropractic, Evergreen Medical Center, PeaceHealth

14  Southwest Medical Center, PeaceHealth Medical Group Neurology, Homewatch

15  Caregivers, Visiting Angels, PeaceHealth Medical Group Bellingham, and Whatcom

16  Physical Therapy/Ferndale Physical Therapy were all incurred before August 27, 2015.

17  The total amount of medical expenses from those providers was $9,586.70.  (Tr. Ex. 099

18  ¶¶ 4-5, Ex. 2.)

19      16.     Ms. Penny incurred medical expenses from Thorsen Chiropractic, Rogue

20  Medicine, Bi-Mart (EnterpriseRx Pharmacy System), and Asante Physician Partners both

21  before and after August 27, 2015.  The total amount of medical expenses incurred on or

22

1   before August 27, 2015 was $2,982.15.  (Tr. Ex. 099 ¶¶ 4-5, Ex. 2.)

2   17.   As discussed above, however, Ms. Penny failed to establish that the injuries

3   she suffered during the accident continued to impact her after August 27, 2015.

4   Accordingly, with one exception, the court finds that the medical expenses that Ms.

5   Penny incurred after August 27, 2015 were not reasonable, necessary, and related to the

6   injuries caused by the accident.  The exception relates to Dr. Sanchez's August 27, 2015

7   recommendation that Ms. Penny obtain a brain MRI.  (Tr. Ex. A-025 at 24.)  Ms. Penny

8   discussed Dr. Sanchez's recommendation with Dr. Kahn's office on October 9, 2015, got

9   an MRI on November 2, 2015, and reviewed the results of that MRI with Dr. Kahn's

10  officer on November 9, 2015.  (Tr. Ex. A-025 at 25-26.)  Because Dr. Sanchez

11  recommended this MRI on August 27, 2015, the court finds that the medical expenses

12  associated with the MRI—which include the MRI costs from Asante Three Rivers

13  Medical Center and the imaging costs from Advanced Imaging Associates—and the

14  expenses associated with Ms. Penny's visits to Dr. Kahn's office to discuss the MRI were

15  reasonable, necessary, and related to the injuries caused by the accident.  The total

16  amount of these MRI-related expenses was $4,492.07.  (Tr. Ex. 099 ¶¶ 4-5, Ex. 2.)

17  18.   Accordingly, the court finds that Ms. Penny established at trial that she

18  incurred a total of $17,060.92 in damages for past medical expenses that were reasonable,

19  necessary, and related to the injuries caused by the August 27, 2014 accident.

20  19.   The court awards total past medical expenses of $17,060.92.

21  20.   Future Medical Expenses.  Ms. Penny's counsel conceded during closing

22  argument that Ms. Penny had not established that she was entitled to future medical

1    expenses.  The court agrees.  Accordingly, the court does not award Ms. Penny any future

2    medical expenses.

3        21.    Noneconomic Damages. Washington law defines the term "noneconomic

4    damages" to mean "subjective, nonmonetary losses, including, but not limited to pain,

5    suffering, inconvenience, mental anguish, disability or disfigurement incurred by the

6    injured party, emotional distress, loss of society and companionship, loss of consortium,

7    injury to reputation and humiliation, and destruction of the parent-child relationship."

8    RCW 4.56.250(1)(b).  The term "disability" includes not only the incapacity to work, but

9    also impairment of a plaintiff's ability to lead a normal life.  *Parris v. Johnson*, 479 P.2d

10   91, 95 (Wash. Ct. App. 1970).  Noneconomic damages need not be reduced to present

11   cash value, WPI 34.02, nor are noneconomic damages susceptible to precise

12   measurement or mathematical certainty, *Rasor v. Retail Credit Co.*, 554 P.2d 1041, 1051

13   (Wash. 1976), and *Wagner v. Monteilh*, 720 P.2d 847, 849-50 (Wash. Ct. App. 1986).

14       22.    Ms. Penny argues that the court should award $175,000.00 in noneconomic

15   damages for past pain and suffering incurred during and after the accident; $150,000.00

16   for past loss of enjoyment of life suffered during and after the accident; $175,000.00 for

17   future pain and suffering that Ms. Penny will continue to experience; and $150,000 for

18   future loss of enjoyment of life.

19       23.    The court concludes that Ms. Penny is entitled to an award of noneconomic

20   damages in the amount of $92,000.00 for past pain and suffering and past loss of

21   enjoyment of life caused by the August 27, 2014 accident.  *See* RCW 4.56.250(1)(b).

22   This amount will compensate Ms. Penny for pain and suffering connected to the day of

ORDER - 29

1    the collision, the following year of recovery, and any loss of enjoyment of life that she

2    suffered in the year after the accident.  The court is satisfied that an award of

3    noneconomic damages in the amount of $92,000.00 will reasonably and fairly

4    compensate Ms. Penny for the injuries proximately caused by Ms. Lindell.  *See* WPI

5    30.01.01.

6          24.     As discussed above, the court concludes that Ms. Penny failed to establish

7    that the August 27, 2014 accident caused her pain and suffering and loss of enjoyment of

8    life after August 27, 2015.  Accordingly, the court does not award Ms. Penny

9    noneconomic damages for future pain and suffering or future loss of enjoyment of life.

10         25.     Total Award:  Thus, the court concludes that Ms. Lindell's negligence

11   resulted in total overall damages of $109,060.92, which includes Ms. Penny's past

12   medical expenses and noneconomic damages.  As discussed above, however, this amount

13   must be reduced by the amount of any insurance proceeds paid out by Ms. Lindell's

14   insurance policy and any PIP insurance proceeds that State Farm has paid to date.

15   Additionally, the total amount after incorporating offsets may not exceed the limits of

16   Ms. Penny's UIM policy.

17                              **IV.    CONCLUSION**

18         On the basis of the foregoing findings of fact and conclusions of law, the court

19   concludes that Ms. Penny is entitled to recover $109,060.92 from State Farm, subject to

20   (a) any applicable offsets from the payments from Ms. Lindell's insurance policy, (b) any

21   PIP insurance proceeds paid by State Farm to date, and (c) any applicable UIM policy

22   limits.  The court reserves entry of judgment until after it determines the amount of any

1   applicable offsets and Ms. Penny's policy limits and ORDERS the parties to submit a

2   stipulation regarding those topics within seven days of the filing date of this order.

3          Dated this 9th day of November, 2020.

4

5

6          JAMES L. ROBART
           United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

ORDER - 31